# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1710V
UNPUBLISHED

| | |
|---|---|
| FRANCISCO CASTELLANOS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND HUMAN SERVICES,<br><br>      Respondent. | Chief Special Master Corcoran<br><br>Filed: March 30, 2022<br><br>Special Processing Unit (SPU); Entitlement to Compensation; Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Guillain-Barre Syndrome (GBS) |

*David John Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Catherine Elizabeth Stolar*, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On November 4, 2019, Francisco Castellanos filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he developed Guillain-Barré syndrome ("GBS") as a result of receiving an influenza ("flu") vaccine on September 28, 2018. Petition, ECF No. 1 at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

---

[1] Although I have not formally designated this Decision for publication, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002, because it contains a reasoned explanation for my determination. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

Petitioner has filed a Motion for a Ruling on the Record and Brief in Support of Damages. For the reasons described below, I find that Petitioner is entitled to compensation, and I award damages in the amount **$125,000.00, solely for his past pain and suffering.**

## I. Relevant Procedural History

As noted above, the case was initiated in November 2019. On January 28, 2021, Respondent filed a Rule 4(c) Report disputing Petitioner's entitlement to a Vaccine Program award. Specifically, although Respondent conceded that Petitioner experienced GBS,[3] he asserted that the medical record did not preponderantly support the conclusion that Petitioner suffered the residual effects of his alleged vaccine-caused injury for more than six months, and that none of the exceptions to the temporal severity requirement were met. Rule 4(c) Report at 10-13 (citing Section 11(c)(1)(D)(i)), 13-15 (citing 11(c)(1)(D)(iii)).

On May 6, 2021, Petitioner filed a Motion for Ruling on the Record and Brief in support of Damages ("Motion"), arguing that he has established entitlement to compensation for his GBS claim and requesting $125,000.00 in past and future pain and suffering (without designating specific amounts for each component). ECF No. 31. Petitioner also argued that evidence in the record preponderantly establishes that he has suffered the effects of GBS for more than six months.

Respondent filed his Response to Petitioner's Motion on June 7, 2021 ("Response") recommending that entitlement to compensation be denied under the terms of the Vaccine Act. ECF No. 32. Despite acknowledging that Petitioner's claim meets the Vaccine Injury Table criteria for GBS, Respondent again argued that Petitioner has not suffered the residual effects or complications of this injury for more than six months. *Id.* at 1, 11-18. And should entitlement be found despite these arguments, Respondent indicated that an award for actual pain and suffering award of no more than $60,000.00 was appropriate. Petitioner filed his Reply on June 17, 2021. ECF No. 33.

## II. Factual Findings and Ruling on Entitlement

### A. Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must demonstrate, by a preponderance of evidence, all matters required under Section 11(c)(1), including the factual circumstances surrounding her claim. Section 13(a)(1)(A).

---

[3] Respondent acknowledges that Petitioner has alleged that the influenza vaccine "caused-in-fact" his GBS, but concedes that Petitioner's injury falls within the Vaccine Injury Table. Rule 4(c) Report at n.5.

2

In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). Contemporaneous medical records are presumed to be accurate. *See Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993). To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)).

In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, GBS is compensable if it manifests within 3-42 days (not less than three days and not more than 42 days) of the administration of an influenza vaccination. 42 C.F.R. § 100.3(a)(XIV)(D). (Further criteria for establishing a GBS Table Injury case be found under the accompanying qualifications and aids to interpretation. 42 C.F.R. § 100.3(c)(15)).

### B. Factual Findings Regarding Severity

Petitioners not asserting a vaccine-related death or other injury requiring a surgical intervention and inpatient care must demonstrate that they suffered the residual effects or complications from their vaccine-related injury for more than six months. Section

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of his injury for more than six months, died from his injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

11(c)(1)(D).[5] I am mindful that (in keeping with the generosity of the Vaccine Program generally, and how that policy concern impacts interpretation of the Act's provisions) severity is not something that should be so rigidly enforced that claims are dismissed simply because the claimant's injury "trails off" toward the conclusion of the six-month period. *See Wright v. Sec'y of Health & Human Servs.*, No. 16-498V, slip op. at 10–11 (Fed. Cl. July 16, 2019).[6] At the same time, Vaccine Act claims are frequently, and properly, dismissed for failure to satisfy this requirement. *See, e.g.*, *Wagner v. Sec'y of Health & Human Servs.*, No. 17-1388V, 2019 WL 3297509 (Fed. Cl. Spec. Mstr. May 8, 2019), *mot. for review denied*, 2019 WL 2866786 (Fed. Cl. June 4, 2019); *Gerami v. Sec'y of Health & Human Servs.*, 127 Fed. Cl. 299 (2014) (upholding dismissal of case on basis of failure to meet severity requirement, where record did not establish injury lasted more than three months, and Petitioner could not persuasively vary record with physician letter prepared in anticipation of lawsuit that was not otherwise corroborated by record evidence).

While even mild symptoms that do not require intensive medical care may satisfy the severity requirement, ongoing medical treatment for conditions unrelated to the alleged vaccine injury do not. *Compare Wyatt v. Sec'y of Health & Human Servs.*, No. 14-706V, 2018 WL 7017751, at *22–23 (Fed. Cl. Spec. Mstr. Dec. 17, 2018) (petitioner's post-vaccination GBS resolved within three months; subsequent ongoing medical treatment for upper respiratory and gastrointestinal infections did not satisfy six-month requirement), *with Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) (ongoing mild GBS symptoms that did not require active medical care nevertheless satisfied severity requirement).

After consideration of the complete record, I find that Petitioner has offered preponderant evidence to establish that he more likely than not suffered the residual effects of GBS for more than six months. My finding is based on the filed medical records, medical literature, affidavits, Respondent's Rule 4 Report and the parties' briefing. Specifically, I highlight the following:

---

[5] Many decisions measure this time period from the date of vaccination, relying on a plain-language reading of the Act. *Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *2 (Fed. Cl. Spec. Mstr. July 18, 2014). However, I believe a more reasonable interpretation is that, since the six-month period measures severity of injury, it cannot begin *before* the time of injury, and hence is properly measured from the date of *onset*. Other special masters have also employed this rule in assessing whether the severity requirement has been satisfied. *Gerami v. Sec'y of Health & Human Servs.*, 127 Fed. Cl. 299, 305 (2014) (citing *Cloer v. Sec'y of Health & Human Servs.*, 654 F.3d 1322, 1335 (Fed. Cir. 2011)). This distinction in interpretation of the Act does not bear on the outcome of this case.

[6] The fact that a petitioner will not be able to show extensive residual impact from a vaccine injury can properly be taken into account in damages calculation, and hence claimants are not "rewarded" for being able to satisfy the severity requirement with weak proof that the injury's sequelae extended only a bit beyond the six-month timeframe.

- Petitioner's pre-vaccination history is significant for diabetes mellitus since at least 2015 with regular diabetic foot exams beginning in March 2016. Ex. 3 at 2-6; 19-22; 31-34; 40-43; 48-51; 69-72; 77-80; 110-113; Ex. 8 at 95-98. At these appointments, Petitioner frequently demonstrated bilateral weakness in his ankles and feet with "loss of protective sensation," a decreased or absent left and/or right dorsalis pedis pulse, and a decreased or absent left and/or right posterior tibial pulse. Ex. 3 at 20, 32, 41, 45, 70, 78, 112.

- On August 7, 2017, Petitioner presented for a follow-up appointment with Dr. Felipe Gascon, his primary care physician ("PCP"). Ex. 3 at 64. Petitioner's diabetic foot screen revealed "[m]ildly decreased lower extremity peripheral pulses." *Id.* at 66.

- On June 5, 2018, Petitioner attended an office visit with Dr. Gascon concerning his complaint of incontinence. Ex. 3 at 106-109. There is no indication that a musculoskeletal or neurological exam was given or that Petitioner complained of symptoms related to his diabetes. *Id.*

- Petitioner was assessed with "type 2 diabetes mellitus with diabetic peripheral angiopathy without gangrene" on June 8, 2018. Ex. 3 at 112. Petitioner was "[a]dvised to wear DM shoes and insoles daily." *Id.*

- Medical notes documenting Petitioner's July 11, 2018 laboratory appointment do not indicate that Petitioner was experiencing abnormal neurological symptoms. Ex. 3 at 114-118.

- Petitioner was administered a flu shot on September 28, 2018. Ex. 1 at 2; Ex. 3 at 249. At the time of vaccination, Petitioner was an 80-year-old retiree. Ex. 4 at 11. In October 2018, Petitioner's granddaughter reported that he was "sedentary, ambulate[d] short distances, like[d] to watch TV" and was able to drive. *Id.* at 82.

- On October 12, 2018, Petitioner presented to Dr. Gascon for a follow-up visit regarding laboratory results. Ex. 8 at 90-94. Petitioner was again assessed with diabetes mellitus with diabetic peripheral angiopathy without gangrene. It was noted that this condition was "stable." *Id.* at 93.

- In his affidavit, Petitioner stated that on October 18, 2018 (almost three weeks post-vaccination), "I woke up and noticed that all of a sudden I was not able to hold my own body." Ex. 2 at 2-3. He noted extreme weakness as well as numbness and tingling in his legs. *Id.* Petitioner further stated that he was unable to rise out of bed, stand, or walk without assistance, and that his condition continued to worsen over the following days. *Id.* at 2.

5

- Petitioner testified that by October 20, 2018 "I started to have numbness and weakness in my hands as well." Ex. 2 at 3. He was transported to the University of Miami Hospital's emergency department later that day. Ex. 4 at 6. Although a CT of Petitioner's head was unremarkable, he was admitted for further evaluation and a neurology consultation. *Id.*

- Petitioner underwent the recommended neurological examination on October 20, 2018. Ex. 4 at 14. The consult note indicates that Petitioner "present[ed] with 2 day acute onset bilateral peripheral numbness upper and lower extremities." Petitioner was found to have muscle weakness, reduced reflexes in his upper extremities, and a loss of reflexes in his lower extremities. The consult note also indicates that Petitioner suffered from bilateral ataxia in both his upper and lower extremities "congruent with weakness." *Id.*

- Petitioner began inpatient physical therapy on October 21, 2018. Ex. 4 at 81-85. The initial evaluation indicates that Petitioner presented with "bilateral knee buckling and poor quad control." *Id.* at 85. He was only able to take two small steps, required a gait belt, and was "unable to grip with [his] hands." Ex. 4 at 84-85. Petitioner denied pain during this session as well as during a follow-up session on October 24, 2018. *Id.* at 72, 82.

- On October 22, 2018, Petitioner began inpatient occupational therapy. Ex. 4 at 77. He questioned why he was unable to use his hands "like before," but denied being in pain. *Id.* at 78. In addition, Petitioner was seen by neurology resident Dr. Mario Zamora and attending neurologist Dr. Silvia Delgado. Ex. 4 at 44-48. Dr. Zamora noted that Petitioner complained of "diffuse weakness," had minimal sensory deficits that only involved his fingertips, and was areflexic. *Id.* at 45.

- Petitioner underwent a lumbar puncture on October 23, 2018 that revealed elevated protein levels in the cerebrospinal fluid and "albuminocytologic dissociation consistent with [GBS]." Ex. 4 at 4, 121.

- After undergoing five rounds of intravenous immunoglobulin ("IVIG") treatment "with significant improvement in . . . neurological status," Petitioner was discharged from hospital care on October 29, 2018. Ex. 4 at 3-6.

- Petitioner received inpatient care at St. Catherine's West Rehabilitation Hospital from October 29, 2018, until November 28, 2018. *See* Ex. 5 at 945, 952, 958. The admissions note indicates that "the only pertinent recent history was flu vaccine 2 weeks prior." *Id* at 7. At the time of his admission, Petitioner required moderate assistance with bed mobility and maximum assistance with transfers. *Id.*

- Petitioner presented to Dr. Gascon on November 29, 2018, for a post-discharge follow-up appointment. Ex. 3 at 130. Although Petitioner denied suffering from any

6

symptoms other than mild weakness in his lower extremities, he used a walker for ambulation. Dr. Gascon recommended a continuation of physical therapy. *Id.*

- Petitioner presented for a diabetic foot exam on December 12, 2018. Ex. 8 at 74-78. Petitioner demonstrated bilateral weakness in his ankles and feet with "loss of protective sensation," a decreased right and left dorsalis pedis pulse, and an absent posterior tibial pulse bilaterally. *Id.* at 76. These findings are consistent with the results of Petitioner's pre-vaccination foot exams. *See* Ex. 3 at 20, 32, and 112.

- Petitioner attended follow-up appointments with Dr. Gascon on January 15 and January 29, 2019. Ex. 8 at 69-73; Ex. 6 at 32-37. The medical notes document that Petitioner was able to walk independently with an assistive device and that he had "[m]inimal weakness of bilateral lower extremities with significant improvement, S/P Guillain Barre syndrome." Ex. 8 at 69; Ex. 6 at 35.

- Petitioner attended physical therapy on an outpatient basis from December 17, 2018 until February 28, 2019, completing 21 sessions. Ex. 5 at 1281-1295. It was recommended that he continue a home exercise plan to further progress his rehabilitation. *Id.* at 1295.

- Petitioner returned to Dr. Gascon on March 12, 2019 (almost five months after hospitalization). Ex. 8 at 49-53. Petitioner denied any weakness and reported that he was feeling "very well" and could walk without assistance. *Id.* at 49. Dr. Gascon's assessment was "Guillain-Barre, Stable." *Id.* at 52.

- Petitioner again reported to his PCP on May 3, 2019 (over six months after hospitalization) to review the results of his blood tests. Dr. Gascon noted that Petitioner "is recovering from [GBS], today is walking without assistance and feels much better." Ex. 6 at 15.

- On July 18, 2019, Petitioner reported to Dr. Gascon regarding the results of laboratory tests. Ex. 8 at 33-37. There is no indication that musculoskeletal or neurological exams were undertaken. Dr. Gascon's assessment did not refer to GBS. Ex. 8 at 33-37.

- On August 12, 2019 – almost ten months after his October 2018 hospitalization, Petitioner returned to Dr. Gascon with complaints of tingling and an "on/off numbness sensation on hands and feet." Ex. 7 at 1. Dr. Gascon noted that Petitioner was "status post Guillain Barre syndrome . . . underwent i[n]patient therapy" and that he should continue physical therapy. *Id.* While Petitioner's assessment included type 2 diabetes mellitus with peripheral angiopathy and chronic kidney disease, it did not include GBS. *See* Ex. 7 at 4-5.

7

- On October 30, 2019, Petitioner met with Dr. Gascon to review his laboratory results. There is no indication that musculoskeletal or neurological exams were undertaken. Dr. Gascon's assessment did not refer to GBS. Ex. 8 at 15-17.

- Petitioner presented to Dr. Eugenio Moises Guevara at Neurology and Pain Management on December 9, 2019. Ex. 8 at 104-107. After noting Petitioner's previous GBS diagnosis, Dr. Guevara wrote that "months ago," Petitioner began experiencing cramps, tingling and [a] sensation of stiffness in both hands . . . refers numbness, tingling in both feet since 2 years ago, associated to instability to walk." *Id.* at 104. Petitioner reported "a good recovery" after his GBS. *Id.* Dr. Guevara's assessment included bilateral carpal tunnel syndrome, neuropathy involving both lower extremities, sensory ataxia, and "[h]istory of GBS." *Id.* at 105. The medical note further indicates that the most common causes of neuropathy were discussed. These causes included, but were not limited to, diabetes mellitus, alcohol use, nutrition and trauma. GBS was not included on this list. *Id.* at 105-106.

- Petitioner had a follow-up appointment with Dr. Guevara on January 13, 2020. Ex. 8 at 109-112. The medical note indicates that although Petitioner's previous complaints of cramps, tingling and a sensation of stiffness in his hands had continued, the numbness and tingling in his feet had decreased with gabapentin. Ex. 8 at 111. Dr. Guevara's assessment again included a discussion of the most common causes of neuropathy. *Id.*

- Petitioner returned to Dr. Gascon for a follow up visit on March 4, 2020 and engaged in a telephone communication with him on April 28, 2020. Ex. 9 at 12, 17. Petitioner did not note any new complaints during these interactions. *Id.* Dr. Gascon did not perform neurological or musculoskeletal examinations during Petitioner's March 4, 2020 visit and GBS was not mentioned. *See id.* at 17-23.

- Petitioner participated in a telehealth visit with Dr. Guevara on June 10, 2020. Ex. 10 at 11-13. In addition to noting that Petitioner was to stop taking gabapentin due to its side effects, Dr. Guevara noted Petitioner's report of continued cramps and bilateral hand tingling. *Id.* He further noted that "there are electrophysiological evidences of bilateral carpal tunnel syndrome" and explained that an EMG "did not show signs of denervation at rest but the patter contraction is deceased with increased polyphasism in all examined muscles suggestive of superimposed cervical diffuse radiculitis." *Id.* at 13.

- Petitioner again presented to Dr. Guevara on June 17, 2020 to receive bilateral carpal tunnel injections. Ex. 10 at 8.

- On December 17, 2020, Petitioner presented to Dr. Gascon for a follow-up visit. Ex. 9 at 5. Petitioner reported living alone and having the ability to perform "all his ADL [activities of daily living]." *Id.* In his review of Petitioner's neurological

8

symptoms, Dr. Gascon noted that Petitioner had a history of both GBS and carpal tunnel syndrome and continued to suffer from "BL [bilateral] hand numbness, tingling sensation and sensation of stiffness." *Id.* at 7.

- In his supplemental affidavit, signed on April 9, 2021, Petitioner states that GBS has impaired his ability to participate in activities of daily living. Ex. 13 at 3. Petitioner avers that he has difficulty walking, standing and maintaining balance due to occasional severe numbness and tingling in his lower extremities. *Id.* Further, Petitioner states that he has difficulty reaching for and carrying objects, driving, and taking care of himself. *Id.*

In this case, because Petitioner received the flu vaccine on September 28, 2018 and claims an onset in mid-October 2018, he must demonstrate that his injuries continued through at least mid-April.[7]

Respondent argues that Petitioner did not suffer the residual effects or complications of his GBS for more than six months. Central to his argument is Petitioner's post-discharge denials of symptoms related to GBS other than mild weakness in his lower extremities. Response at 12 (citing, *e.g.*, Ex. 8 at 79). Respondent appears to reason that because Petitioner denied suffering from any weakness during an appointment with his primary care physician on March 12, 2019 – approximately five months after onset – his GBS had resolved by this date. Respondent at 12 (citing Ex. 8 at 49).

However, the medical note documenting this visit confirms that Petitioner continued to be assessed with GBS, despite its stabilization. Ex. 8 at 52. Further, on May 3, 2019 – *over* six months after Petitioner's October 2018 hospital admission – Petitioner's physician stated that Petitioner "is recovering from [GBS]." Ex. 6 at 15. Despite this language, Respondent argues that the physician's failure to include GBS in the medical record's "assessment" section indicates that it was no longer an ongoing problem. Response at 15. Respondent also argues that the physician's decision to forgo conducting a musculoskeletal or neurological exam further indicates that Petitioner had no ongoing GBS symptoms. *Id.*

In response, Petitioner asserts that "usage of the phrase 'recovering from [GBS]' indicates that he is in the process of recovering, rather than fully recovered from GBS." Reply at 3. I agree. Although the treating physician offers no explanation for this finding and the medical note is somewhat vague, there is simply no reason for me to doubt this determination. Moreover, petitioners are afforded the benefit of close calls in the Vaccine Program. *Roberts. v. Sec'y of Health & Human Servs.*, No. 09-427V, 2013 WL 5314698, at *10 (Fed. Cl. Spec. Mstr. Aug. 29, 2013).

More significantly (and even if the "recovering" language does not allow for an interpretation in Petitioner's favor), the record clearly establishes that Petitioner continued

---

[7] *See supra* note 5.

9

to suffer some mild GBS sequelae *after* the formal six-month "deadline." Thus, Petitioner's August 12, 2019 medical record (documenting his complaint of "tingling and on/off numbness sensation on hands and feet") and supplemental affidavit both reveal lingering GBS symptoms. *See* Ex. 7 at 1; Ex. 13 at 2. Respondent attempts to distinguish them, arguing that Petitioner's lower extremity symptoms date "at least as far back as 2015, secondary to his diabetes" and, therefore "cannot constitute a 'residual effect' under the Vaccine Act." Response at 11. However, while Petitioner was assessed with diabetic peripheral angiopathy and frequently demonstrated bilateral weakness in his ankles and loss of "protective loss sensation" in his feet prior to his September 2018 flu shot, there is no indication that Petitioner complained of numbness or tingling in the months immediately preceding the onset of his GBS, and hence this alternative explanation loses some strength. *See, e.g.,* Ex. 3 at 106-123.

Respondent also argues that Petitioner's "upper extremity symptoms are . . . due to [his] carpal tunnel syndrome." Response at 14. Petitioner was first assessed with this injury on December 9, 2019 – over one year after the onset of his GBS. Ex. 8 at 104-107. It is possible that some of the tingling and numbness in Petitioner's hands is attributable to his carpal tunnel syndrome, but prior to this date (as mentioned above) there is record evidence that Petitioner was still experiencing some likely GBS-related sequelae – so Petitioner has "crossed" the six-month line even if the symptoms beginning at the end of 2019 have nothing to do with his otherwise-established GBS.

Accordingly, I find that there is preponderant evidence to establish that Petitioner suffered the residual effects of his injury for more than six months.

### III.   Other Table Requirements and Entitlement

In light of the lack of other objections and my own review of the record, I find that Petitioner has established that he suffered the Table injury of GBS following a flu vaccine within the Table time period. *See* 42 C.F.R. § § 100.3(a)(XIV)(D). In addition, there is not preponderant medical evidence demonstrating that Petitioner's condition was due to a factor unrelated to the flu vaccine. *See* Section 13(a)(1). Finally, Petitioner has not pursued a civil action or other compensation. Ex. 2 at ¶8; Section 11(c)(1)(E). Thus, Petitioner has satisfied all requirements for entitlement under the Vaccine Act and I find that Petitioner is entitled to compensation in this case.

### IV.   Damages

#### A. The Parties' Arguments

Petitioner requests $125,000.00 in past and future pain and suffering without designating specific amounts for each component. Motion at 1. He asserts that the initial severity of his symptoms, the length and extent of his treatment (which included nine days

of hospitalization, thirty days in an inpatient rehabilitation facility, a lumbar puncture, a five-day course of IVIG, and over 20 physical therapy sessions), warrants an award at that level. Motion at 21-22. Petitioner also emphasizes that his symptoms have continued to interfere with his ability to perform activities of daily living for at least two and a half years. *Id.* at 21. To support the amount requested for his pain and suffering, Petitioner compared the circumstances in his case to those in four other published Program decisions that resulted in pain and suffering awards of $155,000.00 or more: *Francesco*, *Devlin*, *W.B.*, and *Dillenbeck*.[8]

Respondent, by contrast, proposes an award of no more than $60,000.00 for Petitioner's total pain and suffering. Response at 1.[9] Respondent argues that "[P]etitioner cannot reasonably attribute all, or even the majority, of his claimed pain and suffering to GBS, given his multiple comorbidities pre-vaccination." *Id.* at 20. Respondent also pointed to differences between the facts and circumstances in Petitioner's case and those suffered by the petitioners in *Francesco*, *Devlin*, *W.B.*, and *Dillenbeck*. Respondent does not cite any reasoned opinions, but avers that a review of past flu/GBS claims – which were presumably resolved via joint stipulations between the parties or the petitioners' acceptance of a proffer representing Respondent's valuation of their cases – supports an award of $60,000.00 for Petitioner's past pain and suffering. *Id.* at 22.

Petitioner objects to Respondent's failure to identify any reasoned opinions supporting his proposed award of $60,000.00 for a GBS case. Reply at 12-13. He also notes that Respondent's effective position is that Petitioner's pain and suffering from GBS is less than the median award for conceded SIRVA claims resolved either by stipulation or reasoned opinion. *Id.* at 13. (citing *Randazzo v. Sec'y of Health & Human Servs.*, No. 18-1513V, 2021 WL 829572, at *5 (Fed. Cl. Spec. Mstr. Feb. 1, 2021)).

### B. Legal Standards for Damages Awards

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks

---

[8] *Francesco v. Sec'y of Health & Human Servs.*, No. 18-1622V, 2020 WL 6705564 (Fed. Cl. Spec. Mstr. Oct. 15, 2021)($165,000.00 for actual pain and suffering); *Devlin v. Sec'y of Health & Human Servs.*, No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Aug. 7, 2020) ($180,000 for past pain and suffering); *W.B. v. Sec'y of Health & Human Servs.*, No. 18-1634V, 2020 WL 5509686 (Fed. Cl. Spec. Mstr. Aug. 7, 2020)($155,000.00 for pain and suffering); *Dillenbeck v. Sec'y of Health & Human Servs.*, No. 17-428V, 2019 WL 4072069 (Fed. Cl. Spec. Mstr. July 29, 2019)($170,000.00 for past pain and suffering and $10,857.15 for future pain and suffering).

[9] In footnote 18 of his Response, Respondent "reiterates his position that [P]etitioner is not entitled to compensation in this case but provides [a] discussion of damages should the Court ultimately find in favor of [P]etitioner regarding entitlement."

compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation ... determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *See I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.*, No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

Special masters may consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in a specific case. *See, e.g., Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may also rely on my own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### C.  Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that at all times Petitioner was a competent adult with no impairments that would impact his awareness of his injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

When performing this analysis, I review the same record relied upon to determine entitlement, including the filed affidavits, medical records and written briefs. I have also considered prior awards for pain and suffering in both SPU and non-SPU GBS cases,

and rely upon my experience adjudicating these cases.[10]

Here, the evidence shows that Petitioner, a retiree with a pre-vaccination history significant for diabetes mellitus, presented on October 20, 2018 (22 days after his flu vaccination), to the emergency department with a two-day history of progressive weakness and numbness in his extremities, resulting in difficulty holding objects and an inability to walk without assistance. Ex. 2 at 2-3; Ex. 4 at 6. He was admitted to the hospital the same day and, after undergoing a CT of his head and lumbar puncture, was diagnosed with GBS. Ex. 4 at 6, 121. In addition to participating in inpatient physical and occupational therapy, Petitioner underwent a five-day course of IVIG. Ex. 4 at 4, 77, 81-85. After a nine-day hospitalization, Petitioner was transferred to inpatient rehabilitation. Ex. 5 at 7. He was discharged after 30 days of treatment, on November 28, 2018. Ex. 5 at 958.

At his first follow-up visit with his PCP on November 29, 2018, Petitioner denied suffering from any pain, but noted mild weakness of his lower extremities. Ex. 3 at 130. Moreover, he used a walker for ambulation. *Id.* Indeed, Petitioner was still using a walker on January 29, 2019, the date of a subsequent primary care appointment. Ex. 6 at 32. Petitioner was discharged from physical therapy on February 28, 2019 (having completed over 20 sessions) and, by March 12, 2019, reported feeling "very well." Ex. 5 at 1281-1295; Ex. 6 at 21. His GBS was recorded as "stable." Ex. 6 at 24. At Petitioner's May 3, 2019 follow-up appointment, his physician noted that Petitioner "is today walking without assistance," "recovering from [GBS]," and feeling much better. Ex. 6 at 15.

Petitioner's GBS was not mentioned during the following medical appointment on July 18, 2019. Ex. 8 at 33-37. During an August 12, 2019 office visit, Petitioner reported "on/off numbness sensation on [his] hands and feet." Ex. 7 at 1. This symptom was not directly attributed to his vaccine injury. Instead, Petitioner's physician noted that "patient is status post [GBS]" and recommended the continuation of physical therapy. *Id.* Petitioner's assessments included type 2 diabetes mellitus with peripheral angiopathy and chronic kidney disease. *Id.* at 4-5.

In December 2019, Petitioner consulted with a neurologist concerning hand cramping, tingling, and stiffness as well as numbness and tingling in his feet. Ex. 8 at 104. It is at this point in Petitioner's course of treatment that it becomes difficult to disentangle what may be Petitioner's lingering GBS symptoms from his comorbidities, which include diabetes mellitus and carpal tunnel syndrome. *See* Ex. 8 at 104-107 (December 9, 2019 neurology note indicating that "mo[n]ths ago," Petitioner began experiencing cramps,

---

[10] My summary of facts, as set forth in Section II(B) herein, is fully incorporated and relied upon in my decision awarding damages.

tingling and stiffness in his hands, and "since 2 years ago" experienced numbness and tingling in his feet); Ex. 8 at 109 (January 13, 2020 neurology note indicating that while the numbness and tingling in Petitioner's feet had decreased, his hand symptoms persisted); Ex. 10 at 11-13 (June 10, 2020 neurology note confirming evidence that Petitioner suffered from carpal tunnel syndrome). By December 17, 2020 (the date of Petitioner's last medical record), Petitioner continued to report "BL [bilateral] hand numbness, tingling sensation and sensation of stiffness" while also noting his ability to live alone and perform activities of daily living. Ex. 9 at 7.

The case record overall establishes that Petitioner's GBS was on the moderate end of severity in GBS cases. Petitioner did not complain of any pain while hospitalized. Ex. 4 at 72, 78, 82. Moreover, within about five months of GBS onset, Petitioner reported that he was feeling "very well." Ex. 8 at 49.

In addition, Petitioner's GBS occurred in the shadow of his diabetic peripheral angiopathy, bilateral ankle weakness and "loss of protective sensation" in his feet. *See* Ex. 3 at 20, 32, 41, 45, 46, 70, 78, 112. Adding to this "stew" of comorbidities is Petitioner's carpal tunnel syndrome diagnosis, occurring in the winter of 2019 and 2020. *See* Ex. 8 at 104-107; Ex. 10 at 13. Although the medical records document that Petitioner suffered from GBS and was still recovering from this condition in May 2019, his diabetes and carpal tunnel syndrome may partially explain his ongoing reports of cramping, tingling, and stiffness in his hands and numbness and tingling in his feet.

On the other hand, Respondent does not give sufficient credence to the seriousness of GBS as a general matter, or to the facts of this specific case. Although Petitioner did experience a relatively quick recovery, his initial course of treatment was intense: A nine-day hospital stay with a five-day course of IVIG, followed by a 30-day stay in an inpatient rehabilitation facility and over 20 sessions of physical therapy. Further, Petitioner required the use of a walker until at least January 29, 2019 – about four months after onset.

Petitioner has far better substantiated his demand than Respondent. And the number he seeks reasonably balances the seriousness of GBS generally and the relatively invasive nature of Petitioner's initial course of treatment. However, I do agree with Respondent's contention that the present facts are not directly comparable to the damages determinations cited by Petitioner. In such cases, where pain and suffering ranged from $155,000.00 to $180,000.00, the injured party was out of work for several months, experienced significant psychological distress, or endured a subsequent injury because of GBS. *See Dillenbeck* 2019 WL 4072069, at *14; *Devlin*, 2020 WL 5512505 at

\*3; *Francesco*, 2020 WL 6705564 at \*4; *W.B.*, 2020 WL 5509686 at \*5.[11] Moreover, while a six-figure award is justified given the nature of Petitioner's injury, I do give weight to the possibility that Petitioner's comorbidities may partially explain some of the symptoms he experienced – especially after the spring of 2019. I therefore find that **$125,000.00** in compensation for past/actual pain and suffering is reasonable and appropriate in this case.

I do not, however, find that a future pain and suffering component is appropriate. There is no evidence that Petitioner suffered a permanent injury, as corroborated by the views or opinions of a treater (a factor which I typically give great weight when evaluating a request for a future component). And the symptoms Petitioner later began to experience can be distinguished. Accordingly, Petitioner's award shall be limited to past pain and suffering.

### V.     Conclusion

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $125,000.00**, **representing compensation for actual pain and suffering.**

This amount represents compensation for all damages that would be available under Section 15(a). The Clerk of the Court is directed to enter judgment in accordance with this Decision.[12]

**IT IS SO ORDERED.**

                                                    **s/Brian H. Corcoran**
                                                    Brian H. Corcoran
                                                    Chief Special Master

---

[11] Petitioner appears to account for this difference, as his demand is moderately less than the amounts awarded in his case comparisons.

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.